The next matter on our calendar is National Fuel Gas versus New York State Department of Environmental Conservation. And the CR Club will argue as an amicus. As an intervener. Sorry. Let me note for the record that we have 28 J letters from all parties from National Fuel Gas, from NYSDEC, and from the CR Club relating to our recent decision on a constitution pipeline. May proceed. Good morning Judge Pooler and may it please the court. I'm Eamon Joyce on behalf of National Fuel. Under both Step 1 and Step 2 of the Islander East 1 framework, the court should grant National Fuel's petition and vacate DEC's denial. Even if this were like Islander East's Step 2 case alone, DEC's denial letter here is worse than what Connecticut did there. There's no way to conclude in the language of Islander East 1 that DEC adequately examined the relevant record evidence, let alone to find that DEC . . . Are you talking about lack of citations? It goes far beyond lack of citations. It goes far beyond the national connection between any facts in the record and the basis for decisions. It looks just like Islander East 1. The denial fails to say what DEC reviewed. It fails to say what DEC relied on. It fails to say why it dismissed the findings of FERC or any of the evidence put forward by National Fuel. It . . . It's not up to FERC in these situations to do the Clean Water Act analysis, is it? That's correct, Your Honor. I think . . . What are they ignoring as the findings of FERC make any bit of difference in this? Well, they're ignoring exactly . . . This is exactly what happened in Islander East 1, Your Honor. I think my opponents are wrong in trying to frame this up as some kind of Chevron issue. The issue here is not whether FERC is correctly interpreting the Clean Water Act. The fact is that FERC has done fact-finding on these points, both in the EA, which DEC said it would rely on, and in its order. And so . . . It's required to do an environmental assessment. That's right. It's a step-by-step process. The FERC makes the initial determination. It does an EA. And then the states, the individual states . . . This involves both Pennsylvania and New York. That's correct. And the individual states . . . It's kind of a curious federalism kind of posture. But the states are allowed then to determine as to whether they're going to certify that, pursuant to their state water quality standards, that it meets their state water quality standards. That's all correct, Your Honor. But just as an Islander . . . It's not that they must. It's that there's a reasonable assurance that they will. That's also correct. And to your point, Judge Hall, and I think to your point, Judge Wesley, FERC looked at these specific issues in the EA. And FERC made findings on them, both in the EA and in the order. I mean, FERC, for example, in the EA, says that the impacts are going to be short-term. That there are going to be minimal aquatic impacts. That . . . As the state's denial letter characterizes them as permanent. Permanent without any explanation. And it's not just FERC, to your point, Judge Pooler, I think. It's not just FERC that put this evidence forward. We put forward in the application that these were short-term. We put forward an expert affidavit, which you'll find at A1742, where, roughly paragraphs 38 to 40, our expert addressed at length that turbidity was not . . . violative turbidity. Not turbidity. Anytime somebody's in water, there's going to be turbidity. Walk across the stream, you cause it to be . . . That's correct, Your Honor. And our expert said, in the streams of western New York, turbidity is a regular occurrence. That's a result of rains. That's a result of ice flows. So on and so forth. FERC took all that and found that these were short-term impacts. DEC says . . . Doesn't the New York DEC have final say over water quality on these permits? Yes, it has final say. So what FERC said is interesting, but not dispositive. No disagreement there, Your Honor. But just as an Islander East . . . It would be something to measure their decision against to decide what they were . . . how they reasoned it. That's correct, Judge Wesley. I think where we end up here is that DEC and Sierra East won, which is to mine the record for anything that might support their finding. Can we do just a little bit of housekeeping? Sure. Because I don't want to distract from this, but you have an application in front of FERC with regard to whether the DEC's response is timely. Is that it? Yes, that's correct, Your Honor. It would constitute a waiver of their ability . . . That's correct, Your Honor. And let me ask you this. If you win there, and then there's a right for the state to petition to the D.C. Circuit. It's a very curious statute, having explored it previously in Constitution. So, am I right about that in your view? Oh, correct, Your Honor. That's what Constitution says. And just to be clear, Your Honor, we also brought a protective appeal in the D.C. Circuit currently. Presuming that you won there, whatever we said here would be meaningless. I think it would be moot, assuming we won there and they exhausted their appellate rights. Do you have any idea when you think you might hear from FERC? We don't, Your Honor. FERC recently got its quorum back and it started acting on its . . . It got members again. And it started acting on its backlog, but just as I can't control when this Court's going to decide this case, I can't . . . No, I'm not flying to fault with you for that. Okay. But there is a proceeding which would make, render anything that we said moot. That's correct. Depending upon how it prevailed. That's correct. The only twist I'd put on that is the D.C. Circuit at times has said that even a D.C. or state . . . not D.C., excuse me, but a state decision that's ultra vires may end up being of persuasive value to the Army Corps. So, I think that guidance . . . In short, there's no reason for this Court to stay its hand to wait on what FERC's going to do. Lastly, before you go back to your argument, because I don't . . . you know, I'm interested in what you have to say in this, but your first prong is that this was the result not of an analysis, but of a political decision. And you made a motion to expand the record to include e-mails. That motion was denied by the applications judge without leave to renew. You have not renewed that motion to us, have you? No, Your Honor. Judge Raggi denied it with leave to renew. We renewed the motion. This panel denied it with leave to renew at oral argument. And I'd like to renew that motion. I will say, however, on what most of that addendum relates to is prior projects, which are one, judicially noticeable, and the argument that they're somehow outside the record really runs far afield from the record, which I mentioned, our expert . . . So, what's clear is that you're renewing it? Yes. Yes, Your Honor. Mr. Joyce, I hate to continue with housekeeping, and I expect we'll . . . Sure. It's certainly an interesting issue, I think, for all of us, so up to the presider, of course, but we may be a little light with the time. There was no further internal . . . I'll call it internal . . . That's correct. I mean, it's a pretty remarkable decision in that DEC didn't even set an adjudicatory hearing. We've only been through legislative hearings here. Was there one available to your client? No, there wasn't. Well, they did it on the basis of your petition, seeking the 401 certification, right? That's correct. They're not mandated to hold a hearing? No, they're not mandated to hold a hearing, but where there are substantial issues and controversy . . . Excuse me. You submitted your studies in connection with that filing, correct? That's correct. So, you had a case before the DEC? Yes, absolutely. There's no allegation. The denial was not premised on the inadequacy of your responses, unlike constitutional . . . Not . . . I read the denial, Your Honor. You did all the trenchless studies that they wanted you to do. Right, right. You disagreed with them as to how many streams you would do trenchless with. I'm anxious to hear from the State, because they found fault with your desire to use wet digging when you withdrew the proposal to do the one wet trenching that was going to be done. So, they said that they were denying it based on that. When they knew full well you'd already withdrawn that. May I briefly hit on the feasibility analysis and then turn to Step 1, which I haven't had any opportunity to address? I think the feasibility analysis here is telling. DEC begins this process by saying, we may require trenchless. And it says, where we don't require trenchless, we will require dry crossings. And so we come forward and do these very exhaustive analyses, in part influenced by what happened in Constitution. We saw that DEC asked for more and more in Constitution, and we marshaled that stuff out of the gate. I mean, this is an application that dwarfs that in Constitution. And then at the very back end, they say, go do a feasibility analysis. Now, a feasibility analysis on trenchless doesn't sound like a dry crossing is going to be per se harmful. Otherwise, it doesn't make sense to do feasibility. Tell me I'm not going to allow dry crossings. Then we come back, we do the feasibility analysis. And what does this order say? All it says is, some of them we found it feasible, others we didn't. That's a piece of trivia. It doesn't disagree with us about a single one of those feasibility analyses. And then it ignores what the feasibility analysis actually said. In DEC's brief, they suggest the feasibility analysis is economic. That's wrong, Your Honors. At SPA 6, they note what the feasibility analysis is. It's three things. None of them have anything to do with economics. And we did a feasibility analysis, and some of the things we found and put before the agency were that wet crossings would pose, excuse me, not wet crossings, trenchless crossings would cause a greater environmental impact. On one of the streams in particular, you'll find this at A1549, we found, this is the unnamed tributary to Issua, I'm sorry if I pronounced that wrong for those of you up there, would cause more impacts than dry crossing. At A1544, Cataraugus, we found that trenchless would require deforesting three acres. This is a feasibility analysis based on technical geologic concerns and the environment. And they don't say a word of disagreement with it. The feasibility analysis goes on at A1530, A1536, A1525, and finds that other trenchless mechanisms would have required six to 16 days of watering at these sites. The method we chose gets most of these streams done in less than 24 hours, some of them in 48. There's just no basis to affirm here at step two. But is there a way to have the DEC's determination, which is at issue here in our special appendix, reviewed in a successive administrative process under the laws of the state of New York? No, not as I understand what happened here. I believe that had they invoked the adjudicatory hearing process, then there may have been an additional level of statement. But because they did it without adjudication? That's correct. On step, excuse me, step one briefly, I want to focus on part two of our step one argument, which is about DEC far exceeding its statutory mandate. The denial letter itself and DEC's brief have essentially said that New York State is allowed to consider whatever it wants. And what they're citing there is 6 NYC RR 608.9 A6, a state statute, a state regulation not approved by the EPA that says state statutes, regs and criteria otherwise applicable. And they are setting themselves up as the lone arbiter of what state environmental considerations they can consider. There's no authority for that proposition. The law is quite clear. They can't add conditions that aren't related to water quality. They can't premise, but they can't condition their approval on something that might relate to deer habitat or something else. It's only on water quality. And that's a function of the Clean Water Act. That's federal law, not state. That's correct. And there are a lot of federal holdings on this. I don't think it is open to debate, Your Honor. The New York Court of Appeals takes the same view of it in the Mohawk case. That's right. And there are a couple of things I want to point out about Niagara Mohawk. DEC told you when it was here last time that Niagara Mohawk had been overruled by PUD No. 1. I will say that that would be news to the former commissioner of DEC, which issued a decision in Erie Boulevard in 2006 saying PUD No. 1 had no effect on Niagara Mohawk. I'll add to that fray, Your Honors, that DEC made this argument to the United States Supreme Court Niagara Mohawk was pending on CERT while PUD No. 1 was before the court. DEC filed a reply brief in support of CERT, asking the court to hold it for PUD No. 1. That reply brief was filed in March of 1994. Know what? The court held it. PUD No. 1 comes down on May 31, 1994. Seven days later, on June 6, 1994, it denies CERT in Niagara Mohawk. Nothing got overruled. That's the easiest GVR the Supreme Court's ever had before it, if it thought that PUD No. 1 had anything to do with Niagara Mohawk. Counsel, in summary, your time has long expired, and you've reserved three minutes, which I won't take away. Did you want to make, I think we interrupted point one and point two, or did you make your argument?  Thank you, Counsel. We'll hear first from DEC. Thank you, Your Honors. May it please the court, I'm Meredith Lee Clark, on behalf of It's very impressive, Your Honors. Nothing for ADA compliance. May it please the court, I'm Meredith Lee Clark, on behalf of the New York State Department of Environmental Conservation. Your Honors, three months ago in Constitution Pipeline, this court reaffirmed that the Clean Water Act preserves the state's authority to determine issues of the planned project's effect on water quality. New York's Department of Environmental Conservation responsibly exercised that authority here. DEC reasonably determined that National Fuel's proposed pipeline would unacceptably impact water quality across three watersheds. And in particular, National Fuel failed to show that the project would protect water quality at eight wild, highly dynamic, and environmentally sensitive streams that National Fuel proposed to cross with dry trenching, which is highly disturbing, Your Honors. Are all these streams constantly flowing streams? Of these eight streams, they are, Your Honor. Of the 185, are they all constantly flowing streams? The 192 streams that National Fuel proposes to cross in New York State are not constantly flowing. I'm somewhat familiar with the area. It represented Allegheny County a long time ago, 30 years ago. So there are a number of these streams that are dry throughout the summer. That's correct, Your Honor. And so, according to DEC's findings, that dry trenching across those streams would permanently impair those streams also. Not quite, Your Honor. Not quite? DEC determined that for the vast majority of these streams- Well, let me read to you. I mean, SPA 6. These crossings will permanently impair aquatic habitat and generate turbidity that will impair the best usages of these water bodies, thereby violating the state water quality standards. Depending on when these streams were crossed. That would certainly be possible. You didn't mean this to apply to all streams. To these, in particular, what DEC focused on, the DEC denial, demonstrates that DEC wasn't requiring absolute certainty, as National Fuel argues, or that there would be absolutely no impacts. Rather, DEC recognized that National Fuel had performed this feasibility study, and that for the vast majority of these streams, that its generic construction designs would probably be fine. Wouldn't it have been easier to understand what DEC's reasoning was if DEC's denial had focused in on the streams that they thought there would be impairment and identified the reasoning behind why the proposal with regard to those streams wouldn't have worked? And I believe that it did, Your Honor. It did? On pages 6 and 7 of the denial letter, DEC talks about how it went first from 192 streams that it looked at, but then it narrowed its focus to first 55 streams and then identified, and this is all in the record, Your Honor, then identified 13 highly sensitive wild streams in the southern tier and flagged those streams and those crossings for more information from the applicant. And DEC, in its denial letter, lists that they have various Class A, Class B, Class C protections and determined, rationally determined, that the applicant had not met its burden to demonstrate that if it decided to dry trench these streams, that its operations would be sufficiently protective of the water quality standards. And just those streams, the 13 streams? Looking at just those 13 streams and looking at the 8 streams that it proposed to dry trench. So were to read this as relative, all these statements that seem to be generic as referring only to those 13 that the State has no objection to the other 172? I believe that the Department tacitly. Tacitly? It. In a way it could be bound. I mean, I think. We kind of read between the lines when we decide arbitrary and capricious. We give the DEC a little interpretive reading. Is that what we do? I don't think so, Your Honor. Your Honor, the record demonstrates that DEC went through at extensive length with national fuels contractors its concerns about. I understand that, but this 13-page document is the yardstick by which we measure the reasoning. That's correct, Your Honor. And my problem with it is that I don't see any markings on it in inches and feet. All I see is the yardstick. And here's my problem. For example, Special Appendix 7. DEC's recent experiences with constructing large-scale natural gas pipelines across New York State involving multiple water bodies, blah, blah, blah, blah, blah. No reference to what projects were, what types of problems, difficulties there were, how these are similar to the project that's proposed here. I don't know of any projects that have been approved in the last four or five years. But in any event, don't you think it would have been more helpful to us to know what projects you were relying on? I think that DEC could have named them, but I don't think that that's required, Your Honor. If your daughter said, you know, if you had a child, and I'm not, I'll depersonalize it. A parent has a child that says, I really feel good about today. What's the parent say to the child? Well, why do you feel that way? My first question is, well, what are these recent experiences? How do I understand, how do I understand what DEC's reasoning was? There may have been none. What if there were no projects, and DEC just put that in there? Wouldn't that be something on the arbitrary and capricious side? Absolutely, Your Honor, but that's not the case here. So you're telling me that there were projects? Yes, there were, Your Honor. But why aren't they listed? That was... How am I to know? How am I to know on this record, how am I to measure what those projects were and how they substantiate DEC's conclusion? How am I to know that? I believe so. In the record, Your Honor, DEC talks at length with National Fuel about what its past experiences were. Does DEC reference an administrative record on which I can measure what their logic was in their reply? It does not, Your Honor, and it's not required to do so under the Uniform Procedures Act. And so I'm supposed to go look for it and figure out what's connected? As in Islander East 2, DEC fully supported its denial through the administrative record, and that's all that's required, Your Honor. Are you going to tell me that I'm going to find in the administrative record the identification of these projects? I believe that there are references throughout the... Are you familiar with it? You believe. Do you know? I know that there are projects, Your Honor. And it's in the record that we're going to see? I believe that the Region 9 scientists and staff members discussed with National Fuel contractors their concerns and experiences based on their previous permitting decisions. National Fuel should know to what you are referring, since they had this colloquy with the department for the year in which you took to decide this project. That's correct, Your Honor. Does National Fuel decide if this is arbitrary and capricious, or do the three of us? It is absolutely your decision, Your Honor. But the fact remains that the burden for demonstrating that a project will comply with New York's water quality standards remains on the applicant. And the denial letter shows and explains what was lacking in that application, particularly... where DEC was quite specific with what they thought they hadn't been provided. And rightfully so. We agree. This letter... I haven't seen in this letter instances of where... and you can help me out. Tell me where the letter says that there was information that hadn't been provided by National Fuel. That's not exactly what we're arguing, Your Honor. We're arguing that National Fuel, what they submitted was insufficient. It was insufficient to demonstrate that they would be sufficiently protective. You weren't arguing there's a lack of information? No, Your Honor. You're arguing with the process that they proposed to use. That's correct. And in particular, for these eight streams, focusing on those... Which are the only things at issue, right? Correct, Your Honor. That National Fuel continued to rely on its generic construction designs. Despite DEC's encouragement to provide additional protective measures, National Fuel simply didn't do so. They refused to commit to specific actions for these eight priority streams. And National Fuel didn't provide a reasonable assurance that it would meet these water quality standards. It is simply not the department's job to hold the applicant's hand throughout the process. And throughout the record, there's support. And there's no dispute that these trenched crossings will have impacts. National Fuel's own expert consistently stated that there would be impacts from these crossings. DEC simply, based on its expertise, stated that these impacts based on the lack of specificity in its construction standards and also the lack of specificity in terms of how much of the stream bank... Yes, Your Honor. In the time remaining, would you respond to the last point made by opposing counsel when he was at the podium that DEC looked to other statutes, other sections of law beside the 700 sections relating to water quality and that that's an impermissible expansion of the scope of your review? Absolutely, Your Honor. There is simply no merit to that argument. The emails that are proffered by National Fuel as support of its argument that the department looked outside of its water quality standards are totally irrelevant to the project before the court. Additionally, the governor's statement was simply made in response to a question by a reporter asking to comment on National Fuel's statements about the project's economic benefits. And the three words DEC would say simply don't rise to the level of a strong showing... Political theater is all. Sure. I mean, I don't think... We're getting a fair amount of these days, right? Absolutely, Your Honor. And DEC, the governor's statement doesn't talk about DEC's decision-making process, and it doesn't rise to the level of a strong showing that this court required in National Audubon... Well, eliminate the younger Governor Cuomo's posturing for the public. What about some of the emails about trying to come up with reasons for denying this? I don't believe there are any emails in this record about trying to come up, similar to in Islander East 1, there's no similar emails about trying to... So the answer is that there are none? No, that's correct, Your Honor. Seeing that my time has run out, thank you so much, Your Honor. Thank you very much. We'll hear from CR Club, which is an intervener in this case. You can raise that a little bit, now that we know how high-tech we are. It needs oil. It seems a little shaky on his feet, but I think we're okay. May it please the Court, my name is Meneen Naismith with Earth Justice on behalf of Intervener Sierra Club. I'd like to use my time to just hit on a few points that have been raised so far today, particularly with respect to National Fuel's arguments about Step 1. National Fuel claims that DEC is exceeding its statutory mandate by considering other aspects of water quality beyond what National Fuel views to be the water quality certifications. I'd like to, however, highlight the fact that although Judge Wesley said... I think they're wrong about that. I mean, they can consider it, but they can't condition it. They can't condition the certification upon compliance with non-water quality-related environmental concerns. Well, the issue here is not actually conditioning, Your Honor. No, I know that. So I'm saying the fact that you may have thought about it doesn't do anything for me. Yes, and I would say that your decision in Constitution Pipeline actually reaffirms that, where the Court considered whether or not an alternate route could be thought about, and because that had a direct connection to the overall impacts on water quality, that that could come in. And here, erosion, wetlands, riparian vegetation, all of those have just as close a causal connection to the impacts to water quality as the alternate route that was upheld as part of the Constitution decision. Constitution also discusses the arbitrary and capricious standard and the fact that it is quite deferential. It discusses the fact that where an agency decision is sufficiently supported, but even as little as a single cognizable rationale, that that rationale by itself warrants the denial of the petition. And here, DEC provided that rationale. The eight streams that National Fuel was instructed and heavily suggested by DEC that only 13 out of 192 streams were especially sensitive, and therefore that National Fuel should pay particularly close attention to using HDD in those particular locations. National Fuel came back and said no on eight of 13 streams. Well, some of them, they said it was too steep. They offered reasons for that, and that makes, I mean, DEC doesn't address that, does it? Well, Your Honor, what DEC does address is the fact that In Constitution, the argument was, well, no, you have to balance the two. And the steeper the slope, the farther back you have to go, and so therefore the larger the area that you have to denude. And so the impact is greater sometimes in HDD than it is in dry digging. You get a backhorn, you go across it when the stream is dry or you've dammed the stream up. Well, and that may be true, Your Honor, but it doesn't change the fact that using dry crossings at these specific eight locations were going to have unacceptable water quality impacts, according to the department, because of the trout habitat and the designation of those streams as trout habitat. Are those streams always running? Do we know? I believe that most of them are running, but, Your Honor. No, just from the record, do we know? I can't give you the site, Your Honor. If we don't know, then we don't know how DEC decided between that dry digging was dangerous. There's no proposed wet digging. That's correct. Agree with me on that? Yes. And so we don't know how DEC weighed the difference between HDD and some alternate source with regard to the digging. But with regard to these eight streams, we do, Your Honor, and I believe I cannot give you the site and the record, but I am sure the record does indicate whether or not these particular eight streams are constantly running or not. DEC, let's presume they are. Okay. Did DEC do an evaluation of the damage to the habitat, to the surrounding area, if HDD was used in the areas where National Fuel had assessed that the slope was too deep or steep on the banks of the stream such that HDD was more damaging than the method they proposed? Your Honor, DEC very clearly weighed the submissions that National Fuel provided and nevertheless concluded, well, even if you can't do HDD, it is still unacceptable for us for you to use dry crossing. Well, I don't understand if they said, we've measured it and we've decided that it's better to deforest four acres of land so that you can push a pipe underneath. That isn't the only option, Your Honor. The other option is to deny the permit. The option is not necessarily to just choose between HDD and dry crossing. And if DEC had said that, then we'd know, but we don't know. They just said they didn't provide enough with regard to the use of HDD. That was the point of the denial letter. Excuse me. She can answer your question, too. Did they say that, therefore, HDD was inappropriate with regard to the streams that they wanted HDD to go and so, therefore, they denied the permit on that basis? No, Your Honor. What they said, if I may, what they did say, they did not specifically address the question you're asking, but they nevertheless got to the larger point. And the larger point is whether or not this project will comply with water quality standards. The options are not simply the pipeline must go forward and it's a function of choosing HDD versus dry crossing. I agree with you. They accepted the findings that HDD was not feasible, but nevertheless there was a reason that those 13 streams were put on a list where HDD was the preferred method and where dry crossing was not. And the fact that the result of the feasibility analysis was we can only do dry crossing very reasonably, and this is on page six and seven, in the denial, led the department to have to say, we're sorry, we cannot allow this project to go forward because it does not show compliance with water quality standards. Fair enough. Thank you. You've put some meat on the bones that I've been looking for. Thank you. Thank you. Thank you. Counsel? Yes. Mr. Joyce, you have three minutes for rebuttal. Thank you. I think I'd like to make three points. One on the lack of information. The second on eight streams. The third is related on other projects. The first point, I have no idea what this denial is based on now. The letter doesn't say it's based on a lack of information. The brief says it is, page 55. The project can't be successful and still protect the water quality that DEC is charged with protecting. What don't you understand? Respectfully, Judge Pooler, I'll get to that in a second. The brief says the denial thus resulted from National Fuel's failure to provide information. Counsel just stood here and said it's not based on a failure to provide information. That violates the core of State Farm. We're done. That's a vacate and remand. And what we don't know. Count those chickens. So let's turn to what they say doesn't qualify. That takes me straight into step two on the eight streams. First of all, consistent with your point, Judge Wesley, I don't know where in this order it's eight streams that it's what we're arguing about. You identified page S.P.A. 6. I think S.P.A. 5 is even better. With respect to 184 crossings, impacts and damages will necessarily occur. Page S.P.A. 7 to 8, the narrative standard for turbidity will be violated where in-water construction occurs. That's not an eight stream decision. And then when you get to the eight streams, again, there's no rebuttal of the feasibility analysis we did. As I said to you, Judge Hall, a feasibility analysis doesn't make sense unless DEC is conceding that there are some circumstances where dry crossing is going to meet it. There's no rebuttal to the point I made earlier that we found HDD. When the request was made, Mr. Joyce, for the asked, they were asked, sorry, they asked you, your client, for a feasibility analysis. Was that binary? I mean, give us one or the other, tell us why one works and one doesn't? Or lay out what you think is feasible and what has the best feasibility of all of this, and we will decide whether that's going to work. So it's binary in some ways in that there are streams that simply can't be crossed, as Judge Wesley pointed out. Look, I think there's a different kind of order that could be written, right, where it says we've looked at the eight streams and we've looked at your feasibility analysis. We acknowledge it's not feasible to do these by HDD, but we don't think these eight streams can be crossed using dry crossings. That's not what this order says, and it doesn't actually take on the factual points. You know, they say that these are necessarily going to cause turbidity violations. You can't square that with anything in the record, and you also can't square that with specific findings of the federal agency. You can look at FERC at A174. Impacts on fisheries are short term. They say there's something special about these eight streams because they're trout spawning streams. Well, you know what? We point in our brief on page 50 to the Atlantic Bridge Crossing, approved after this, where they approved three dry crossings of trout spawning streams. No explanation whatsoever for why there's this difference. There's nothing in the record that gets you there. And then the final point I'll make is on other projects, not just on that 2017 grant post-dating ours. The effort to say we have experience with some of these other crossings, that's not in the record anywhere. DEC, as we point out ñ You claim not to know about the discussions that went on during the year between national – It was ñ I do not know, Your Honor, of any point – Your client. Neither I nor my client know. Of any point in the record where DEC said our recent experiences with dry crossings has caused us to change our view. It doesn't make sense because they told us that they'd be requiring dry crossings. It doesn't make sense because in 2015 they approved dry crossings at Algonquin. It doesn't make sense because in 2017 they approved dry crossings at the three streams I just mentioned. So if there was this history that was going to happen, first of all, they needed to tell us what it was. Second of all, per Islander East, one, this is exactly what Connecticut tried to do in Islander East. It said, we think this is going to be bad because the Iroquois project was bad. And this court required Connecticut to show why the methods that Islander East was using were analogous to those used in Iroquois. Here, you can't make that showing. It's not in the record, but you also can't make it because we went so far above and beyond. We submitted an application that's eight times the size of the one in Constitution just to avoid all this. Thank you, counsel. Thank you, your honors. Thank you all. Very lively argument. Very interesting issue. We'll reserve decision. Can't get away from these unusual.